# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ROBERT MUNRO and CHARLES MILLER
on behalf of themselves and all others similarly
situated,

      Plaintiffs,    Case No.: 24-cv-01041-GBW

      v.

TEN OAKS MANAGEMENT, LLC and
TOG FAS HOLDINGS LLC

      Defendants.

### PLAINTFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR BIFURCATED, EXPEDITED DISCOVERY

  Plaintiffs Robert Munro and Charles Miller, on behalf of themselves and the class they seek to represent, respectfully submit this brief in opposition to defendants' Motion to Dismiss or in the Alternative for Bifurcated, Expedited Discovery.[1]

  This is a case under the Worker Adjustment and Retraining Notification Act, or "WARN Act," 29 U.S.C. § 2101 *et seq.* The WARN Act generally requires that an employer give 60 days' advance written notice before ordering a "plant closing" or "mass layoff." Plaintiffs, and the class they seek to represent, were employed by US Logistics Solutions,

---

[1] If the Court were to dismiss the case, it should be without prejudice and with express permission to re-plead. *Shane v. Fauver*, 213 F.3d 113, 115-17 (3d Cir. 2000).

1

Inc., until it shut down without any advance WARN Act notice whatsoever. (Complaint, ¶¶ 16, 34).

1.  **The Complaint states an archetypal and strong case for "single employer" liability.**

Defendants in this case – two entities in the "Ten Oaks" group, a private equity business[2] – are sued under the WARN Act's "single employer" doctrine. The allegations of the Complaint offer a paradigm case for "single employer" liability.

    A.    **The law.**

The "single employer" doctrine is encapsulated in the pertinent WARN Act regulation:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). The leading cases construing and applying this doctrine under the WARN Act include *Pearson v. Component Technology*, 247 F.3d 471 (3rd Cir. 2001), *Childress v. Darby Lumber*, 357 F.3d 1000 (9th Cir. 2004), and *Guippone v. BH S&B Holdings*, 737 F.3d 221 (2nd Cir. 2013).

The "single employer" doctrine, utilizing the DOL factors and looking at the realities of entanglement and control, applies not only to "independent contractors,

---

[2] https://tenoaksgroup.com

2

subsidiaries," and "parent[s]" (20 C.F.R. § 639.3(a)(2)) but to others such as equity investors, *Guippone*, 737 F.3d at 226, and lenders, *Pearson*, 247 F.3d at 496.

Courts applying this single-employer test in WARN Act cases commonly recognize these important principles: (1) no one factor listed in the regulation is controlling;[3] (2) the regulation's list of factors is (as the regulation explicitly says) non-exhaustive, thus allowing flexible application to specific circumstances as they arise;[4] (3) one way of framing the ultimate question is whether the two entities operated at "arms' length" or were more closely aligned than that;[5] and (4) if the *de facto* exercise of control factor is particularly striking – such as if an entity other than the nominal employer actually makes the operative decision with no regard for the nominal employer's nominal legal separateness – then that in itself may suffice to make the decision-maker part of a "single employer" with WARN Act liability.[6]

If an entity other than the nominal employer exercised sufficient control over or was sufficiently entangled with the nominal employer, then that other entity is liable for the WARN Act violation.

> As an initial matter, we think it important to consider the policy considerations that animate the WARN Act. The purpose of the Act is to penalize those employers that close a plant and fail to comply with the notice

---

[3] *See, e.g.*, *Guippone*, 737 F.3d at 226.

[4] *See, e.g.*, *Pearson*, 247 F.3d at 491.

[5] *See, e.g.*, *Pearson*, 247 F.3d at 495 ("Affiliated corporate liability under the WARN Act is ultimately an inquiry into whether the two nominally separate entities operated at arm's length.").

[6] *See, e.g., Guippone*, 737 F.3d at 228, quoting *Pearson*, 247 F.3d at 504.

> requirements of the statute. Thus, the question of whether two entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, it can be determined that two entities should be considered jointly liable for the closing and the subsequent lack of notice. ... Accordingly, the goal of the five-factor test here is to determine whether APA Truck Leasing had become "so entangled with [APA Transport's] affairs so as to engender WARN Act liability," or whether the two continued to function at arm's length as separate entities.

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 244 (3d Cir. 2008), quoting and citing *Pearson*.

The issue of de facto control is central in many cases, and is (at this point, at least) central in this one: "if the de facto exercise of control was particularly striking – for instance, were it effectuated by "disregarding the separate legal personality of its subsidiary," … -- then liability might be warranted even in the absence of the other factors." *Pearson*, 247 F.3d at 504.

As an example of this principle in operation, summary judgment on "single employer" liability was entered in favor of plaintiffs in *Chaney v. Vt. Bread Co.*, No. 2:21-cv-120, 2023 U.S. Dist. LEXIS 148066, *21-26 (D. Vt. Aug. 23, 2023), because the private equity business directed the plant closing in violation of the WARN Act. The principle is clear: if the private equity business makes the decision – exerting control without maintaining an arms' length relationship and without allowing the nominal employer to make the decision – then there is "single employer" liability.

B.   The facts.

With the complaint's allegations taken as true and the facts viewed as they must be on a motion to dismiss, Ten Oaks made the decision to shut down US Logistics. US Logistics' President said so on LinkedIn right after Ten Oaks killed US Logistics: "<u>Due to the abrupt decision by our private ownership group to close our doors</u> at the same time business was surging, I am completely devastated and heartbroken for the 2000+ professionals I've had the pleasure of working with. The timing of this closure did not give me the chance to thank my team for their commitment and support to our customers and to each other." (Ex. 1) (emphasis added).

Ten Oaks[7] bought US Logistics (then named Forward Air) around three years earlier, creating a new Ten Oaks entity (defendant TOG FAS Holdings) as a holding company. (Complaint, ¶ 28(a)-(c)). Ten Oaks renamed the company as US Logistics and moved its headquarters. (¶ 28(d)). Thus the thorough and direct control by Ten Oaks was apparent from the start.

"Although there were officers in name at [US Logistics], board meetings and minutes were never kept. Instead, all decisions related to [US Logistics] were made by the managing boards of Ten Oak Entities." (¶ 28(g)).

In particular, Ten Oaks exercised control through its agent, "Executive Operating Partner" Andrew Lovrovich. Lovrovich "had no official role at [US Logistics], was not on [US Logistics] payroll and did not have a [US Logistics] email address." (¶ 28(h)).

---

[7] The "Ten Oaks Group" consists of defendant Ten Oaks Management, LLC, which is the top-tier entity, "together with its subsidiaries, affiliates and portfolio companies." *See* http://www.tenoaksgroup.com.

5

Ten Oaks – attempting to evade the motion-to-dismiss standard and argue its own version of the facts – asserts that actually Lovrovich was the "Executive Chairman" of US Logistics. As such, Ten Oaks argues that even if Lovrovich did do all the things alleged – up to and including ordering the death of US Logistics – maybe he was doing so while wearing a "hat" (Doc. 6 p. 15) that magically made him acting on behalf of US Logistics itself rather than Ten Oaks. But again, this is an attempt to ignore the Complaint and to make up facts. There is nothing to suggest that anyone gave Lovrovich that "hat" or title other than Ten Oaks itself. At this point in the case, it means nothing other than "I am the man with the power over US Logistics"; it does not show that the power was given to him by US Logistics, or that he was ever an officer or even an employee of US Logistics. His own LinkedIn resumé does not include any stint as an employee or officer of US Logistics (or, indeed, any other company within the Ten Oaks portfolio of investments), but shows him as having worked exclusively for Ten Oaks throughout the relevant time period. (Ex. 2). If his job at Ten Oaks gave him the authority to call himself Executive Chairman over US Logistics – with power up to and including the power to order its shut-down and sign its bankruptcy petition – that simply confirms that the de facto control of US Logistics lay with Ten Oaks throughout.

Lovrovich, acting from his perch at Ten Oaks, took charge of various aspects of US Logistics business. "Despite not having a role at [US Logistics], Lovrovich frequently issued orders and directions to [US Logistics] personnel from his @tenoaksgroup.com email address." (¶ 28(i)). "Lovrovich regularly communicated with [US Logistics] vendors

despite having no official role with USLS" (¶ 28(k)), and "Ten Oaks Entities frequently directed decisions relating to pricing" of US Logistics' services (¶ 28(l)).

Lovrovich and Ten Oaks also specifically took charge of decisionmaking relating to employment at US Logistics. "Ten Oaks Entities frequently directed decisions related to … RIFs (reductions in force) at" U.S. Logistics. (¶ 28(l)). "Specifically, when RIFs were conducted for [US Logistics] employees, Lovrovich would first inquire from [US Logistics] employees about the cost-benefit analysis as to specific employees and afterwards would send emails to Human Resources directing which employees would be subject to the RIF." (¶ 28(m)). Furthermore, Ten Oaks both installed, and then later removed, a CEO at US Logistics. (¶ 28(p)). In fact, "At all relevant times, all management-level personnel decisions relating to [US Logistics] were made by Ten Oaks Entities." (¶ 28(o)).

Ten Oaks also dominated US Logistics' finances even at the daily level. "At all relevant times, USLS was completely dependent on Ten Oaks Entities for its daily operating funds which were provided either directly by Ten Oaks Entities or through financing arranged by Ten Oaks Entities." (¶ 28(j)).

The Complaint also explicitly alleges that it was Ten Oaks, that made the decision to shut down US Logistics, terminating all employees without WARN Act notice. (¶ 28(q), (r), (u)). This is not some allegation of a legal conclusion that can be ignored. It is an allegation of historical fact, to be taken as true. And its plausibility is enhanced by the other allegations – including the allegations (as recounted above) that Ten Oaks (acting largely through Lovrovich) had taken control of all major decisionmaking – even including

personnel decisions such as who would be CEO of US Logisticcs, and who would be laid off in prior RIFs.

The allegation that Ten Oaks made the decision to shut down US Logistics is also made more plausible by the further allegations about the end of US Logistics. It was Lovrovich who, "despite having no role in [US Logistics], … sent out and conducted two conference calls to announce the immediate closure of [US Logistics]. The first call was with the upper management of [US Logistics], and the second call was with terminal managers across the country." (¶ 28(s)). And it was "Ten Oaks Entities by Lovrovich [who] decided to file the Chapter 7 petition on behalf of [US Logistics] even though he was not a [US Logistics] employee." (¶ 28(t)).

Ten Oaks argues that even though Lovrovich was the one who told US Logistics' upper management that US Logistics was shutting down (¶ 28(s)), maybe Lovrovich was simply communicating a decision that had been made by someone else. This, again, is an attempt to make up a different set of facts that ignores the Complaint. If it wasn't Lovrovich that made the decision to kill US Logistics, it must have been someone else at Ten Oaks – because, with the Complaint taken as true, it certainly was not any separate governing body of US Logistics itself. (¶ 28(g) ("Although there were officers in name at [US Logistics], board meetings and minutes were never kept. Instead, all decisions related to [US Logistics] were made by the managing boards of Ten Oak Entities."). And, as noted above, the President of US Logistics said that it was Ten Oaks ("our private ownership group")

that made the decision to shut down US Logistics. Those are the facts at this point in the case, on motion to dismiss.

With these being the facts at this stage of the case, there is "single employer" liability under *Pearson* and *APA*. If Ten Oaks made the decision – as is alleged – then Ten Oaks is liable. This is the pinnacle of "de facto control" and, under *Pearson* and *APA*, that in itself is enough to create single-employer liability.[8]

**2.      Plaintiffs have adequately pleaded a WARN Act violation.**

Defendants argue that the Complaint does not adequately plead a violation of the WARN Act, in that (they contend) it is not adequately alleged that the death of US Logistics led to job losses for at least 50 full-time employees at particular facilities.

The WARN Act requires notice in advance of "plant closings" and "mass layoffs." 29 U.S.C. § 2102. This case, it appears, most likely involves "plant closings" – because it involves "the permanent or temporary shutdown" of places of work, 29 U.S.C. § 2102(a)(2), rather than mere reductions in force. A "plant closing" covered by the WARN Act is "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees," *id*. A part-time employee, who does

---

[8] Many of the same allegations also go towards other "factors" under the governing single-employer test, such as ownership, centralized control of labor relations, and dependency. But given the clarity and plausibility of the allegation of complete de facto control, including control over the WARN Act violation itself, it is unnecessary to belabor that at any length.

not count towards this 50-employee threshold, is an "employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required. 29 U.S.C. § 2101(a)(8).

Defendants make this argument first as to the facilities where the named Plaintiffs worked (in Texas and in Georgia), and second as to other facilities where other members of the putative class worked. Neither argument is reason to dismiss the case.

### A.     The Texas and Georgia facilities where the named Plaintiffs worked.

The Complaint alleges that named Plaintiff Munro worked at the Atlanta, GA, Facility (¶ 9) and that named Plaintiff Miller worked at the the Humble, TX, Facility (¶ 10). The Complaint alleges that, at each of those Facilities, more than 50 employees (excluding part-timers) were terminated in the shutdown. (Complaint, ¶ 31: "The mass layoff or mass layoffs and/or plant closing at the Facilities resulted in 'employment losses,' as that term is defined by the WARN Act for at least fifty (50) of Defendants' employees as well as 33% of Defendant's workforce at each Facility, excluding 'part-time employees,' as that term is defined by the WARN Act.").

Defendants are therefore flatly wrong in calling this Complaint "substantially similar" to the one found deficient in *Sanchez v. AFA Foods, Inc. (In re AFA Inv., Inc.)*, Nos. 12-11127 (MFW), 12-50710 (MFW), 2012 Bankr. LEXIS 5764, at *16-17 (Bankr. D. Del. Dec. 14, 2012). The problem in *AFA* is that the Complaint appears not to have alleged that at least 50 employees lost their jobs at any facility – there were allegedly 200 or so employees, divided among five facilities, with no allegation about how many were at any given facility. *Id.* Here, by contrast, there is the express allegation that the threshold number

was met. (The other case on which Defendants rely for this argument, *Guippone v. BH S&B Holdings LLC*, 681 F. Supp. 2d 442, 446 (S.D.N.Y. 2010), is distinguishable on the same basis: the complaint there contained literally no alllegation about how many people worked at the facilities in question.)

This leaves only Defendants' argument that paragraph 31 is a mere "formulaic" or conclusory allegation that can be ignored under *Iqbal* and *Twombly*. They are wrong in this as well. It cannot be and is not incumbent on a WARN Act plaintiff to allege exactly how many people worked for the employer, or exactly how many of them were terminated in a plant closing, or exactly how many of them were full-time within the WARN Act's precise definition. Employees in non-union workforces have no conceivable way of knowing the precise particulars about those things. The information that would allow precision about those things is in the possession and control of the employer. (An employee can allege how many people were terminated at each facility, *if* the employer gives even a belated WARN Act notice – because the employer is required to tell state and local governments how many employees lost their jobs at each facility. 20 C.F.R. § 639.7(e), (f). But where the employer fails to give even belated WARN Act notice, it hides that information.)

That is why it is sufficient for a WARN Act plaintiff to allege simply – even, indeed, to allege on information and belief – that the numerical threshold is met. This is reflected, for instance, in *Shaw v. Hornblower Cruises & Events, LLC*, 2023 U.S. Dist. LEXIS 94220 (S.D.N.Y. May 31, 2023) (a case from which Defendants cite an earlier order, but fail to note this one). There, the case involved an alleged "mass layoff" and so it was necessary to allege not only that a sufficient number of employees had been laid off, but also that they

11

constituted at least 33 percent of the workforce. Plaintiffs, not having access to the information about the size of the workforce, alleged on information and belief that at least 33 percent had lost their jobs. The Court found that this was sufficient, because the information was in the possession and control of the employer, thus making it acceptable for plaintiffs to rely on the unadorned allegation on information and belief. *Id.*, *6-9.

Here, Plaintiffs have alleged expressly that the number of full-time employees was sufficient to constitute WARN-covered plant closings. That is enough. If Defendants actually have information that leads them to believe that the allegation is incorrect, they are welcome to share that information with Plaintiffs' counsel who will consider it in good faith.

### B.     Other facilities.

Plaintiffs also seek to represent a class consisting not only of employees in Georgia and Texas but also at other facilities where plant closings (or mass layoffs) occurred at the same time. Defendants argue that there is no allegation of where the other facilities were, or which of them had enough terminated employees to constitute a WARN-covered event. It is true that Plaintiffs do not know that, at this point. It is information within the possession and control of the employer.

This is not a basis for "dismissing" the case. It is a premature attempt to limit the scope of the class, before class certification is even on the table. It would do no good to make any ruling on this question now. (*Shaw*, *supra*, shows the trouble that arises when one tries to make a premature ruling on this sort of question: you get months of expensive motion practice, and expenditure of lots of judicial effort, about questions that could be

answered through simple discovery practice or good-faith discussions between counsel.) Discovery will show which facilities terminated enough employees to constitute events for which WARN Act notice was required. There is no reason to preclude employees at those facilities from recovering the WARN Act relief to which the law entitles them, just because Plaintiffs do not yet know what the employer's payroll records will show.

3.  **Discovery should neither be bifurcated nor expedited.**

This Court, in its discretion, should not take this case out of the ordinary course of discovery. It would not be useful to bifurcate or expedite, such that discovery happens first – and on a shortened time frame – only about the "single employer" issue.

In a WARN Act case, discovery is generally about two things: (1) the composition of the workforce – i.e., things such as the number and identities of people employed at the various facilities, the dates that they were laid off or terminated, and what their wages and benefits were; and (2) what happened, culminating in the plant closing or mass layoff (that is, in general, how the company came to be in distress, and how the decision was made to have a shut down or mass layoff).

That is true of this case as well. Those will be the primary topics of discovery, unless Defendants try to unnecessarily complicate the process.

The first of those topics usually does not require complicated or expensive discovery, unless Defendants pick unnecessary fights. The critical questions can be answered through production of employment records. This will show, for instance, which facilities had enough employees terminated *en masse* to constitute plant closings or mass

13

layoffs. And it will allow for identification of class members, and mathematical calculation of their WARN Act remedies. It should be simple, if Defendants approach it with good faith. Occasionally there is a WARN Act case where there is a genuine dispute about some aspect of this part of the case – and, if so, it is good to know that early in the case rather than putting it off until later in the case. If disputes about such things remain buried and unexplored, then the chance of settlement is much reduced.

The second of those topics – what happened that culminated in the plant closing or mass layoff – is not separable from the "single employer" question in this case. As noted above, the question of *de facto* control is central to the "single employer" question in this case. Discovery into the context and facts of the decision to order the plant closing or mass layoff will inherently involve inquiry into *who* was involved in the decisionmaking, and who called the shots. It would not be practicable or efficient to draw a line between general WARN Act merits discovery in this sense, and WARN Act single employer discovery. It would be unworkable, for instance, to have a "first" deposition of Mr. Lovrovich that was somehow *only* about the "single employer" issue – including what level of control he exercised over the decision – while making other questions about the death of US Logistics off-limits. The same would be true of depositions of other participants. It would make no sense to depose them twice – once asking thoroughly about the involvement of Mr. Lovrovich and Defendants, and then later another deposition about other aspects of the death of US Logistics. Somehow purporting to bifurcate "single employer" discovery from "merits" discovery about the shutdown is not workable – and if it were workable, it would not be efficient.

Plaintiffs recognize that it would be possible to bifurcate discovery in the sense of ordering that discovery on topic #1 mentioned above would not be had until *after* all merits discovery was done and the "single employer" issue was litigated to summary judgment. It would be possible, but it would be inefficient. It would slow down the case unnecessarily, as contrasted to the normal course of litigation which leads to one round of discovery and one set of summary judgment briefs for the Court to consider. And, as noted above, postponing discovery on topic #1 would mean that there was less likelihood of a prompt settlement. But even if the Court postponed discovery about topic #1 mentioned above, the there is no reason to *expedite* discovery about the "single employer" issue and the decision to shut down. Defendants have offered no real justification for any such expediting.

## Conclusion

Defendants' motion should be denied.

Dated:  December 23, 2024

                                            Respectfully submitted,

By: /s/ James E. Huggett_____
**MARGOLIS EDELSTEIN**
James E. Huggett (#3956)
300 Delaware Avenue
Suite 800
Wilmington, DE 19801
Phone 302-888-1112
Fax 302-888-1119

**LANKENAU & MILLER, LLP**
Stuart J. Miller (SJM 4276)
Johnathan Miller
100 Church Street, 8th FL

New York, NY 10007
P: (212) 581-5005
F: (212) 581-2122

**THE GARDNER FIRM, P.C.**
Mary E. Olsen (OLSEM4818)
M. Vance McCrary (MCCRM4402)
182 St. Francis Street
Suite 103
Mobile, Alabama 36602
P: (251) 433-8100
F: (251) 433-8181

*Attorneys for Plaintiffs*