## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBERT MUNRO and CHARLES MILLER
on behalf of themselves and all others
similarly situated,

                      Plaintiffs,

        v.

TEN OAKS MANAGEMENT, LLC and TOG
FAS HOLDINGS LLC,

                      Defendants.

C.A. No. 24-1041-GBW

---

James E. Huggett, MARGOLIS EDELSTEIN, Wilmington, DE; Stuart J. Miller, Johnathan Miller, LANKENAU & MILLER, LLP, New York, NY; Mary E. Olsen, M. Vance McCrary, THE GARDNER FIRM, P.C., Mobile, Alabama.

       *Counsel for Plaintiffs*

Paul S. Seward, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, DE; Kelly Robreno Koster, Deryck Van Alstyne, BRACEWELL LLP, Houston, Texas.

       *Counsel for Defendants*

## MEMORANDUM OPINION

February 13, 2025
Wilmington, Delaware

_____
GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court is Defendants' Motion to Dismiss or, in the Alternative, for Bifurcated, Expedited Discovery ("Motion") (D.I. 5), which has been fully briefed (D.I. 6; D.I. 12; D.I. 13).[1]  For the following reasons, the Court grants-in-part and denies-in-part Defendants' Motion.  Since the Court was able to resolve the Motion without oral argument, Defendants' Application for Oral Argument (D.I. 14) is denied-as-moot.

## I.    SUMMARY OF FACTS

The following are factual allegations taken as true for the purpose of Defendants' Motion.  Mr. Munro worked at the Atlanta, Georgia facility of US Logistics Solutions Inc. ("USLS").  D.I. 1 ¶¶ 1, 9.  Mr. Miller worked at the Humble, Texas facility of USLS.  D.I. 1 ¶¶ 1, 10.  USLS is 100% owned, either directly or indirectly, by TFH.  D.I. 1 ¶ 28(e).  In turn, TFH is 100% owned, either directly or indirectly, by TOM.  D.I. 1 ¶ 28(f).

Defendants' boards of directors made decisions related to USLS regarding pricing, reductions in workforce, plant closings, and management personnel.  D.I. 1 ¶ 28(g), (l), (o), (q), (r).  For example, Defendants installed Roger Norris ("Mr. Norris") to the position of Chief Executive Officer and also removed him from that position.  D.I. 1 ¶ 28(p).[2]  In addition, Defendants established and maintained common personnel policies and healthcare plans for

---

[1] The lead plaintiffs in this putative class action are Robert Munro ("Mr. Munro") and Charles Miller ("Mr. Miller") (together, "Plaintiffs").  The defendants are Ten Oaks Management, LLC ("TOM" or "Ten Oaks") and TOG FAS Holdings LLC ("TFH" or "Holdings") (together, "Defendants" or "Ten Oaks Entities").

[2] The Complaint does not expressly allege that Mr. Norris' role was at USLS.

Defendants and USLS.  D.I. 1 ¶ 28(n).  Defendants also managed the financing of USLS's operations. D.I. 1 ¶ 28(j).  USLS did not record the minutes of its board meetings.  D.I. 1 ¶ 28(g).

The Executive Operating Partner of TOM was Andrew Lovrovich ("Mr. Lovrovich").  D.I. 1 ¶ 28(h).  Mr. Lovrovich engaged in activity that involved USLS.  For example, Mr. Lovrovich, from his TOM e-mail account, frequently issued orders and directions to USLS personnel.  D.I. 1 ¶ 28(i).  Mr. Lovrovich also regularly communicated with USLS vendors.  D.I. 1 ¶ 28(k).  In addition, Mr. Lovrovich evaluated the cost-benefit analyses of USLS employees and transmitted e-mails to the human resources department instructing the termination of certain employees.  D.I. 1 ¶ 28(m).

On June 20, 2024, Mr. Lovrovich conducted two conference calls — the first with USLS upper management and the second with USLS terminal managers — to announce the closure of USLS.  D.I. 1 ¶ 28(s).  The same day, USLS terminated Plaintiffs without providing notice of termination sixty days prior to termination.  D.I. 1 ¶¶ 9-10, 34.  The same day or after, USLS terminated approximately 2,000 additional employees from either the Atlanta facility, the Humble facility, or other USLS facilities (together, the "Facilities"), again without providing notice of termination sixty days prior to termination.  D.I. 1 ¶¶ 12, 34.  Plaintiffs, along with the additional terminated employees, compose the putative class.  On June 21, 2024, Mr. Lovrovich filed a Chapter 7 bankruptcy petition on behalf of USLS.  D.I. 1 ¶ 28(t).

Defendants did not remunerate the putative class members for the sixty working days following their individual terminations.  D.I. 1 ¶ 35.  Defendants likewise did not contribute to any pension or 401(k) accounts of the putative class members, provide any members of the putative class other employee benefits under the  Employee Retirement Income Security Act, or pay the

medical expenses of the putative class members, for the sixty working days following their individual terminations. D.I. 1 ¶ 35.[3]

On September 16, 2024, Plaintiffs filed their Class Action Complaint and Demand for Jury Trial ("Complaint") in this Court. D.I. 1.  Therein, Plaintiffs allege that Defendants violated the Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act") by failing to provide the putative class members with notice of their individual terminations at least sixty days prior to termination. D.I. 1 ¶ 1.

On November 25, 2024, Defendants moved to dismiss. D.I. 5.  In summary, Defendants contend that Plaintiffs cannot recover against Defendants since USLS, and not Defendants, terminated the putative class members, and that Plaintiffs have failed to sufficiently allege that USLS and Defendants constitute a "single employer" for the purpose of the WARN Act. D.I. 6 at 3-15.  Defendants also contend that Plaintiffs fail to sufficiently allege various additional requirements of the WARN Act, including, for example, the number of employees terminated and the location(s) of the facilities at issue. D.I. 6 at 15-18.  In lieu of dismissal, Defendants request expedited and bifurcated discovery on the "single employer liability" issue. D.I. 6 at 18-19. Plaintiffs oppose Defendants' grounds for dismissal and Defendants' alternative request for expedited and bifurcated discovery. D.I. 12.

## II.    JURISDICTION AND LEGAL STANDARDS

### A.    Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

---

[3] Plaintiffs did not expressly allege that USLS did not remunerate or provide such benefits to the putative class members for the sixty working days following their individual terminations.

**B.    Motion to Dismiss**

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. 662, 678). But the Court will "'disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th 335, 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

In evaluating a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Pinnavaia v. Celotex Asbestos Settlement Tr.*, 271 F. Supp. 3d 705, 708 (D. Del. 2017) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)), *aff'd*, 2018 U.S. App. LEXIS 38873 (3d Cir. Apr. 6, 2018). Rule 12(b)(6) requires the Court to "accept all factual allegations in a complaint as true and take them in the light most favorable to Plaintiff." *Brady v. Media*, No. 23-cv-1078-GBW, 2024 U.S. Dist. LEXIS 160991, at *4 (D. Del. Sep. 6, 2024). "A motion to dismiss 'may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting *Burlington Coat Factory*, 114 F.3d at 1420). The "movant bears the burden of demonstrating that the complainant failed to state

a claim upon which relief may be granted." *Abbott Diabetes Care, Inc. v. DexCom, Inc.*, No. 23-cv-239-KAJ, 2024 U.S. Dist. LEXIS 96985, at *4 (D. Del. May 31, 2024).

## III.    DISCUSSION

This Discussion has the following Sections: (A) Plaintiffs sufficiently allege that USLS and Defendants are a single employer for the purpose of the WARN Act as a matter of law; and (B) Plaintiffs fail to allege other requirements of the WARN Act as a matter of law.  Since the Court is dismissing Plaintiffs' Complaint, the Court denies-as-moot Defendants' alternative request for bifurcated and expedited discovery on the single employer liability issue.

### A.    Plaintiffs Sufficiently Allege that USLS and Defendants Are a Single Employer for the Purpose of the WARN Act as a Matter of Law

"Congress enacted the WARN Act in 1986 in response to extensive worker dislocation occurring throughout the 1970s and 1980s as a result of companies being acquired, merging, or closing." *Hampton v. Navigation Capital Partners, Inc.*, 64 F. Supp. 3d 622, 625 (D. Del. 2014) (citing *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 239-40 (3d Cir. 2008)).  "Not only did employees working at these companies often lose their jobs without any notice, but at times the projected closing was actively concealed from the employees." *Id.* (citing *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999)).  "Thus the stated purpose of the WARN Act is 'to allow workers to adjust to the prospective loss of employment, to seek and obtain alternative jobs and . . . to enter skill training or retraining that will allow [them] to successfully compete in the job market.'" *Id.* (quoting *Hotel Emps.*, 173 F.3d 175, 182).  "Therefore, the 'thrust of WARN is to give fair warning in advance of prospective plant closings.'" *Id.* (quoting *Hotel Employees*, 173 F.3d 175, 182).

"Giving effect to this intent, the WARN Act requires that employers employing at least 100 full time employees provide 60 days written notice prior to a plant shutdown or a mass layoff."

*Id.* (citing 29 U.S.C. § 2101 *et seq.*). "Employers that violate the WARN Act's notice requirement are liable to the affected workers for each day notice is not provided, for up to 60 days." *Id.* (citing 29 U.S.C. § 2104(a)).

While the WARN Act permits recovery only against employers, there is a "standard for inter-corporate liability" that "rests on whether the relevant companies have become 'so entangled with [one another's] affairs' that the separate companies 'are not what they appear to be, [and] in truth they are but divisions or departments of a single enterprise.'" *Czyzewski v. Sun Capital Partners, Inc.*, 526 B.R. 547, 552 (D. Del. 2014) (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir.1982)). Courts often reference the resulting test for determining "inter-corporate liability" as the "single employer liability" test.

The Department of Labor has "promulgated relevant factors for courts to use when considering whether to impose derivative liability under the WARN Act on an affiliated corporation: (1) common ownership; (2) common directors and/or officers; (3) de facto exercise of control; (4) unity of personnel policies; and (5) dependency of operations." *Id.* (citing 20 C.F.R. § 639.3(a)(2)). The Third Circuit has adopted these factors. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 490-91 (3d Cir. 2001).

The single employer liability factors "are similar to those of the 'single entity' analysis under the federal alter ego test, but conflicts within existing case law have resulted in various jurisdictions applying slightly different tests for liability under the WARN Act." *Czyzewski*, 526 B.R. 547, 552. The "factors 'are meant as a nonexhaustive list' so as to allow courts to '[exercise] the flexibility that this area of law requires.'" *Hampton*, 64 F. Supp. 3d 622, 627 (quoting *Pearson*, 247 F.3d 471, 491). The balancing test is thus not a "mechanical exercise," but instead "an inquiry

into whether the two nominally separate entities operated at arm's length." *Id.* (quoting *Pearson*, 247 F.3d 471, 504).

"Generally, if only the first two factors are present - common ownership coupled with common management - liability is not established." *Id.* (citing *Pearson*, 247 F.3d 471, 494). "The last three factors — de facto exercise of control, unity of personnel policies emanating from a common source, and dependency of operations - are often the determinative factors." *Id.* (citing *In re APA Transp.*, 541 F.3d 233, 244). "Among these three factors, de facto exercise of control is the most important, and a 'particularly striking' showing of de facto control can warrant liability even in the absence of the other factors." *Id.* (quoting *Pearson*, 247 F.3d 471, 504).

Here, Defendants contend that Plaintiffs failed to sufficiently allege "single employer liability" under the WARN Act, including with respect to each of the five factors. *See* D.I. 6 at 3-15. Defendants' overarching conclusion, however, is incorrect. Plaintiffs' allegations are sufficient at this stage of the litigation to allow the Court to draw the reasonable inference that USLS and Defendants are a single employer for the purpose of the WARN Act. As discussed below, factors one, three and four of the single employer liability test weigh in favor of single employer liability, while factors two and five do not weigh in favor of single employer liability. *See Hampton*, 64 F. Supp. 3d 622, 628-29 (holding that plaintiff sufficiently alleged single employer liability where the first three factors, but not the fourth and fifth, weighed in favor of single employer liability); *see id.* at 627 (recognizing that the third factor is the "the most important"). Each factor is discussed below.[4]

---

[4] The Court addresses two preliminary issues raised in Defendants' reply brief. *First*, Defendants contend that "Plaintiffs improperly attempt [in their opposition brief] to bolster their claims by introducing new facts and attaching extrinsic documents that were not included in their Complaint." D.I. 13 at 5. The Court, however, does not rely on any of these new facts and extrinsic documents. *Second*, Defendants take issue with how the factors for the single employer liability

1.   **The First Factor (Common Ownership) Supports "Single Employer Liability" as a Matter of Law**

In their opening brief, Defendants concede that TFH "does own 100% of USLS." D.I. 6 at 5. With respect to TFH, the first factor thus weighs in favor of single employer liability.

Defendants contend, nevertheless, that TOM's purported ownership of TFH is "demonstrably false as evidenced by public records." D.I. 6 at 5. Defendants contend that such falsity is "evidenced by the Form D Notice of Exempt Offering of Securities filed by Holdings with the U.S. Securities and Exchange Commission," which purportedly explains that "Holdings is a 'pooled investment fund' with no less than five separate investors." D.I. 6 at 5 (citation omitted).

---

test "were presented in the Complaint" and then employed by Plaintiffs in their opposition brief. D.I. 13 at 3. In their Complaint, Plaintiffs delineated specific allegations for each of the five factors. D.I. 1 ¶ 28. In their opposition, Plaintiffs then contend that they sufficiently pled factors (for example, de facto control) on the basis of allegations that Plaintiffs originally specified as support for other factors (for example, dependency of operations). *See, e.g.*, D.I. 12 at 6-8. Defendants contend that this "approach essentially amounts to repleading the Complaint without formally amending it." D.I. 13 at 3. Although Defendants' "argument has some merit, it is up to the Court's discretion to decide whether the complaint is sufficiently confusing to justify the relief requested." *See Giovanni v. Bayer Props., LLC*, No. 20-cv-2215, 2021 U.S. Dist. LEXIS 84018, at *4 (E.D. Pa. May 3, 2021) (issuing ruling in the context of Federal Rule of Civil Procedure 10(b)). This action is not, for example, a "case with multiple defendants, or where the plaintiff intermingles causes of action from different statutes." *See id.* "In those situations, courts are more likely to grant a motion" to dismiss or "for a more definite statement because of an overriding need for or benefit from clarity." *See id.* Here, there is predictable overlap between the factors for the single employer liability analysis and, the Court will not sanction Plaintiffs for not re-alleging each allegation for each overlapping factor, when the parties and the Court are readily able to appreciate the predictable overlap. *See Hampton*, 64 F. Supp. 3d 622, 628 ("In reaching this conclusion, the Court disagrees with Defendant's contention that facts which satisfy the first two prongs [of the single employer liability test] cannot also be relied on to show that the third prong, de facto control, is satisfied as well. Given the flexibility that this area of law requires, and the non-exhaustive nature of the listed factors, Defendant's approach is overly rigid." (cleaned up)). Moreover, Defendants fail to cite any case law that precisely exemplifies a previous court rewarding such relief. Defendants cite instead, for example, a decision acknowledging the rule that courts "can only consider the well-pleaded factual allegations set forth in the complaint, not allegations raised in briefing." D.I. 13 at 3 (citation omitted). Here, however, the Court relies on sufficient allegations in the Complaint.

However, even were the Court to judicially notice the SEC form cited and relied upon by Defendants, Plaintiffs make several allegations that sufficiently allow the Court to draw the reasonable inference of common ownership between TOM and USLS, even if such ownership is indirect. These allegations include:

   a.  On its website, TOM describes itself and subsidiaries as "a family office exclusively focused on investing in corporate divestitures.

   b.  On or about February 11, 2021, Forward Air Solutions agreed to sell its pool distribution to TOM.

   c.  In anticipation of this purchase, on February 3, 2021, TOM formed TFH to hold its interest in Forward Air Solutions.

   d.  After Ten Oaks Entities purchased Forward Air Solutions, Ten Oaks Entities renamed it US Logistics Solutions LLC and moved the headquarters from Tennessee to Humble, TX.

   e.  TFH owns 100% of the equity interests of USLS either directly or indirectly.

   f.  TOM owns 100% of the equity interests of TFH either directly or indirectly.

D.I. 1 at 5-6 (missing closing double quotation mark in the original). The first factor thus weighs in favor of single employer liability with respect to TOM as well.

Defendants' remaining contention is unavailing. Defendants contend that TOM's alleged indirect ownership interest in USLS "is insufficient to establish common ownership as a matter of law, as courts have routinely held that indirect or 'grandparent' corporations are not common owners of the subsidiaries of their subsidiaries." D.I. 6 at 6 (citation omitted). Defendants, however, attempt to illustrate this "routine" practice with a single decision from outside of the Third Circuit. D.I. 6 at 6 (citing *Guippone v. BH S & B Holdings LLC*, No. 09-cv-1029-CM, 2010 WL 2077189, at *4 (S.D.N.Y. May 18, 2010), *aff'd*, 737 F.3d 221 (2d Cir. 2013)). Absent controlling authority, this Court need not adopt such a rule. *See Wahl Clipper Corp. v. Conair Corp. & Conair LLC*, No. 23-cv-00114-JCG-LDH, 2024 U.S. Dist. LEXIS 23526, at *2 (D. Del.

Jan. 16, 2024) (holding that out-of-circuit cases "are not binding on this Court"); *see also Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case." (alteration in original) (quoting *Camreta v. Greene*, 563 U.S. 692 (2011)). Moreover, the Court declines to adopt such a rule here, including because such a bright line rule would risk effective abrogation of single employer liability for machinating employers.

**2.    The Second Factor (Common Directors and/or Officers) Does Not Support "Single Employer Liability" as a Matter of Law**

Defendants correctly observe that Plaintiffs fail to allege any common directors and/or officers between USLS and Defendants. *See* D.I. 6 at 7-8. As such, this factor does not weigh in favor of single employer liability.

**3.    The Third Factor (De Facto Exercise of Control) Supports "Single Employer Liability" as a Matter of Law**

The "de facto control factor involves a determination as to whether one company 'was the decision-maker responsible for the employment practice giving rise to the litigation.'" *Hampton*, 64 F. Supp. 3d 622, 627 (quoting *In re APA Transp.*, 541 F.3d 233, 245). In *Hampton*, the Court held that the following allegations were sufficient as to the third factor:

> NCP constructed a brand (Metadigm) and used the Metadigm companies as alter egos in order to dominate a particular section of the energy market including by: hiring an executive to identify prime acquisition companies, buying these companies, and then folding them into a single corporate chain; creating a holding company purely for the purpose of managing these companies; populating at least one of the Metadigm companies (Services) with enough NCP executives to comprise a majority on its board and installing the same executives in the same important positions in the other companies (Holdings and Engineering), including positions involving closely overseeing the operations, finances, and strategy of Metadigm.

*Hampton*, 64 F. Supp. 3d 622, 628-29.

Here, Plaintiffs allege (1) USLS "board meetings and minutes were never kept," (2) "all decisions related to USLS were made by the managing boards of Ten Oak Entities," (3) Mr. Lovrovich "was not on USLS payroll and did not have a USLS email address," (4) Mr. "Lovrovich frequently issued orders and directions to USLS personnel from his @tenoaksgroup.com email address," (5) Mr. "Lovrovich regularly communicated with USLS vendors despite having no official role with USLS," (6) the Defendants "frequently directed decisions relating to pricing and 'RIF's (reductions in force) at USLS," (7) "when RIFs were conducted for USLS employees, [Mr.] Lovrovich would first inquire from USLS employees about the cost-benefit analysis as to specific employees and afterwards would send emails to Human Resources directing which employees would be subject to the RIF," (8) Mr. "Lovrovich sent out and conducted two conference calls to announce the immediate closure of USLS," and (9) "[u]pon information and belief, the decision to shut down the Facilities without providing proper WARN notice was made by Ten Oaks Entities on behalf of USLS and the Defendants, as a single employer." D.I. 1 ¶ 28. As in *Hampton*, the "totality of the[se] facts alleged in the complaint support a plausible inference that [Defendants] 'disregard[ed] the separate legal personality' of [USLS]." *See Hampton*, 64 F. Supp. 3d 622, 629 (citation omitted).

Defendants' contentions and case law to the contrary are unavailing. *First*, Defendants contend that courts must distinguish between instances where a parent has "assumed responsibility for the ongoing viability of a company" and instances "where the true employer retains ultimate responsibility." D.I. 6 at 8 (citing *Pearson*, 247 F.3d 471, 505). Defendants compare Mr. Lovrovich's bankruptcy filing and "conference calls to announce the immediate closure of USLS" to the facts in *In re DHP Holdings II Corp.*, 447 B.R. 418, 424 (Bankr. D. Del. 2010). D.I. 6 at 9. *In re DHP Holdings II* held that "the fact that the Debtors' boards (including [the indirect owner's]

12

directors) approved the bankruptcy filing or facility closings, [was] insufficient to establish that [the indirect owner] ordered the terminations" for the purpose of establishing de facto control.  447 B.R. 418, 424.

Defendants, however, misplace their reliance on *Pearson* and *In re DHP Holdings II*.  As described above, Plaintiffs' allegations here are *facially plausible* in that they allow the Court to draw the *reasonable inference* of de facto control; whereas the facts in *In re DHP* and *Pearson* were insufficient to *establish* de facto control for the purpose of summary judgment.  *See In re DHP Holdings*, 447 B.R. 418, 424; *Pearson*, 247 F.3d 471, 496.[5]

*Second*, Defendants contend that "Plaintiffs do not allege any facts to support that Mr. Lovrovich conducted these actions on behalf of TOM and Holdings rather than in his role as Executive Chairman of USLS."  D.I. 6 at 9.  In support, Defendants cite *In re Consolidated Bedding* (D.I. 6 at 9-10), which held:

> As to the third factor, de facto control, Plaintiffs allege that by virtue of the fact of the AmCap Directors' service on the Debtors' boards of directors, American Capital exercised de facto control over the Debtors. Plaintiffs have not, however, alleged facts showing that the AmCap Directors were wearing their American Capital "hats" while making difficult decisions for the Debtors to close the Facilities and file for bankruptcy.

*Azzata v. Am. Bedding Indus., Inc. (In re Consol. Bedding, Inc.)*, 432 B.R. 115, 122 (Bankr. D. Del. 2010).  Defendants contend that the allegations here "contain the same failure as they do not allege any facts indicating that Mr. Lovrovich was acting on behalf of the 'Ten Oaks Entities' in announcing the immediate closure of USLS or filing the USLS Bankruptcy Petition."  D.I. 6 at 10.

---

[5] The irony of Defendants' reliance on summary judgment decisions, in light of Defendants' subsequent disapproval of Plaintiffs' reliance on summary judgment decisions, is not lost on the Court.  *See* D.I. 13 at 1 ("Plaintiffs rely heavily on *Chaney v. Vermont Bread Co.*, but this case is *procedurally* and factually distinct. In *Chaney*, the Court granted *summary judgment* based on extensive evidence of direct private equity control, which Plaintiffs have not, and cannot, adequately allege here." (citation omitted) (emphases added)).

Defendants add that the "Complaint's silence on this issue stands in stark contrast to the USLS Bankruptcy Petition, which clearly reflects that it was executed by Mr. Lovrovich in his capacity as Executive Chairman of USLS." D.I. 6 at 10.

However, as described above, Plaintiffs' allegations are facially plausible in that they allow the Court to draw the reasonable inference of de facto control. In fact, Plaintiffs' allegations here are more robust than the meager allegations in *In re Consolidated Bedding*. Furthermore, since Mr. Lovrovich's apparent executive chairmanship of USLS would not affect the Court's analysis, at least at this motion-to-dismiss stage, the Court declines Defendants' footnoted invitation to judicially notice USLS's bankruptcy filing.[6]

For the foregoing reasons, the third factor weighs in favor of single employer liability. In light of the Court's holding, the Court does not consider each argument raised by Plaintiffs (or counter-arguments raised by Defendants).[7]

---

[6] Defendants also cite *In re AFA Investment*. D.I. 6 at 10. That decision held that de facto control was not sufficiently alleged when the plaintiff did not allege any specific facts showing how the parent company "controlled the decision-making process[]" and that "[s]imply stating that [the parent company] made the decision to order the mass layoff is insufficient." *See* 2012 WL 6544945, at *4. Here, however, Plaintiffs did not simply state that Defendants "made the decision to order the mass layoff." *See id.*

[7] *See, e.g.*, D.I. 12 at 5 (raising additional factual allegations not in the Complaint); D.I. 12 at 6 ("There is nothing to suggest that anyone gave Lovrovich that 'hat' or title other than Ten Oaks itself. At this point in the case, it means nothing other than 'I am the man with the power over US Logistics'; it does not show that the power was given to him by US Logistics, or that he was ever an officer or even an employee of US Logistics. His own LinkedIn resumé does not include any stint as an employee or officer of US Logistics (or, indeed, any other company within the Ten Oaks portfolio of investments), but shows him as having worked exclusively for Ten Oaks throughout the relevant time period. If his job at Ten Oaks gave him the authority to call himself Executive Chairman over US Logistics – with power up to and including the power to order its shut-down and sign its bankruptcy petition – that simply confirms that the de facto control of US Logistics lay with Ten Oaks throughout." (citations omitted)).

14

4.    **The Fourth Factor (Unity of Personnel Policies) Supports "Single Employer Liability" as a Matter of Law**

The "fourth factor looks to whether there was a unity of personnel policies, and is 'analogous to a determination of whether the companies had a centralized control of labor operations.'" *Hampton*, 64 F. Supp. 3d 622, 627 (quoting *Young v. Fortis Plastics, LLC*, No. 12-cv-364-JD-CAN, 2013 WL 5406276, at *6 (N.D. Ind. Sept. 24, 2013)). "The overall question is 'whether the companies actually functioned as a single entity with regard to [their] relationship[ ] with employees.'" *Id.* (alternations in original) (quoting *In re APA Transp.*, 541 F.3d 233, 245). "This inquiry considers 'whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping.'" *Id.* (quoting *In re APA Transp.*, 541 F.3d 233, 245). "Nevertheless, 'the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations.'" *Id.* (quoting *Pearson*, 247 F.3d 471, 504).

In *In re AFA Investments*, this Court explained and held:

> With respect to the fourth factor (policies emanating from a common source), Sanchez alleges that Yucaipa "maintained centralized *control* over payroll and other personnel policies, including manner and rates of pay and incentive and benefits programs." Sanchez, however, again fails to state any facts to show that "the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping." Sanchez does not allege that Yucaipa established any specific personnel policies on behalf of the Debtors or that it enforced any such policies. Thus, the Complaint does not support the conclusion that Yucaipa and the Debtors "actually functioned as a single entity with respect to [personnel] policies on a regular, day-to-day basis."

*In re AFA Inv., Inc.*, No. 12-11127-MFW, 2012 WL 6544945, at *5 (Bankr. D. Del. Dec. 14, 2012) (citations omitted) (emphasis added).

Here, Plaintiffs allege:

    n.      At all relevant times, USLS and the Defendants maintained common personnel policies which were put into place by Ten Oaks Entities including payment of wages, as well as a common health care plan all of which was carried out by Ten Oaks Entities.

    o.      At all relevant times, all management-level personnel decisions relating to USLS were made by Ten Oaks Entities.

    p.      Specifically, Roger Norris was installed as the CEO by Ten Oaks Entities and was removed from his post in August 2023 by Ten Oaks Entities.

    q.      Upon information and belief, the decision to order a Plant Closing without providing a WARN notice was made by Ten Oaks Entities on behalf of USLS and the Defendants.

D.I. 1 ¶ 28(n)-(q).

These allegations allow the Court to draw the reasonable inference of "unity of personnel policies" between Defendants and USLS. *See Hampton*, 64 F. Supp. 3d 622, 627. Indeed, they support that "the companies actually functioned as a single entity with regard to [their] relationship[ ] with employees." *See id.* For example, the allegations at ¶ 28(n) and (o) regard "whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping." *See id.* (quotation marks omitted).

Moreover, Plaintiffs' allegations are stronger than the allegations in *In re AFA Investment* (relied upon by Defendants (D.I. 6 at 12)). For example, while the plaintiff in *In re AFA Investment* alleged that defendant "maintained centralized *control* over payroll and other personnel policies" (*In re AFA Inv., Inc.*, 2012 WL 6544945, at *5), Plaintiffs here alleged that Defendants established *and* "maintained *common personnel policies*" regarding wages and healthcare (D.I. 1 ¶ 28(n) (emphasis added)). Unlike the allegations in *In re AFA Investment*, Plaintiffs here also alleged that at "all relevant times, all management-level personnel decisions relating to USLS were made by Ten Oaks Entities." D.I. 1 ¶ 28(o). Plaintiffs exemplify such practice with Defendants' alleged installment and removal of Mr. Norris as CEO. D.I. 1 ¶ 28(p). Moreover, the decision in *In re*

*AFA Investment* was predicated on *In re APA Transport*, the latter of which was decided in the context of summary judgment. *In re APA Transp.*, 541 F.3d 233.

Defendants' remaining contentions to the contrary are unavailing. For example, Defendants contend that "the Third Circuit held that control over hiring and firing the company's president and CEO and overseeing the hiring of a few other top managers was 'not enough to find a "unity" of personnel policy.'" D.I. 6 at 13 (quoting *Pearson*, 247 F.3d 471, 499-500). However, *Pearson* is distinguishable for multiple reasons, including because the companies at issue in *Pearson*, unlike USLS and Defendants here, did not share or coordinate their "labor policies." *Pearson*, 247 F.3d 471, 499. In addition, as described above, the Third Circuit affirmed the district court's ruling in *Pearson* in the context of a motion for summary judgment, not a motion for dismissal.[8]

For the foregoing reasons, the fourth factor weighs, at least slightly, in favor of single employer liability.

## 5.  The Fifth Factor (Dependency of Operations) Does Not Support "Single Employer Liability" as a Matter of Law

The "fifth factor considers whether there was a dependency of operations between the two companies." *Hampton*, 64 F. Supp. 3d 622, 627. "Courts must look to the 'existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances.'" *Id.* (quoting *In re APA Transp.*, 541 F.3d 233, 245). "This factor 'cannot be established [merely] by the parent corporation's exercise of its

---

[8] Defendants also cite *In re Consolidated Bedding* in support. D.I. 6 at 12. However, in that case, the plaintiffs "offered no facts supporting any of the considerations specified by *APA Transport*" and instead argued that "that the role [the parent company] played in the decision to close the Facilities" was "sufficient to meet *Pearson's* unity of personnel policies factor." *In re Consol. Bedding*, 432 B.R. 115, 122. As such, the allegations in *In re Consolidated Bedding* are dispositively distinguishable from the allegations here.

ordinary powers of ownership, i.e; to vote in directors and set general policies.'" *Id.* (quoting *Pearson*, 247 F.3d 471, 501).

In *Cruz v. HMR Foods Holding, LP*, the plaintiffs alleged that the defendants "engaged in 'weekly,' if not 'daily' control of HMR." 602 B.R. 855, 871 (Bankr. D. Del. 2019). However, the Court explained that "the specific activities described (such as advising about regulatory duties, reviewing financial information on a weekly basis, visiting facilities, and negotiating executive management compensation) [were] consistent with the HMR Directors' duties as board members, and the Arlon Defendants' ordinary powers of ownership." *Id.* The court explained further that a "dependency of operations does not arise through supervising the [subsidiary's] activities or placing representatives on the [subsidiary's] board of directors." *Id.* "Instead, there must be a 'high degree of integration' so that the [subsidiary] relies on the [parent] corporation for the ordinary operation of its day-to-day business." *Id.* at 871-72 (citation omitted). The court found that there were "no allegations that the Arlon Defendants and HMR shared administrative or purchasing services, interchanged employees or equipment, or commingled bank accounts or finances." *Id.* at 872. For these reasons, the court held that plaintiffs failed to plausibly allege dependency of operations. *Id.*

Here, Plaintiffs allege:

j.  At all relevant times, USLS was completely dependent on Ten Oaks Entities for its daily operating funds which were provided either directly by Ten Oaks Entities or through financing arranged by Ten Oaks Entities.

k.  Lovrovich regularly communicated with USLS vendors despite having no official role with USLS.

l.  Ten Oaks Entities frequently directed decisions relating to pricing and "RIF"s (reductions in force) at USLS.

m.  Specifically, when RIFs were conducted for USLS employees, Lovrovich would first inquire from USLS employees about the cost-benefit analysis as

18

to specific employees and afterwards would send emails to Human Resources directing which employees would be subject to the RIF.

D.I. 1 ¶ 28(j)-(m).

Plaintiffs' allegations are insufficient to allow the Court to draw the reasonable inference of dependency of operations for at least three vital reasons. *First*, Plaintiffs fail to allege the "existence of arrangements" regarding "the sharing of administrative or purchasing services, interchanges of employees or equipment, [or] commingled finances." *See Hampton*, 64 F. Supp. 3d 622, 627. *Second*, Plaintiffs' allegations that Mr. Lovrovich communicated with USLS vendors and engaged in the RIFs regard a minor component of operations and fail to allow the Court to draw the reasonable inference of dependency of operations as a whole.

*Third*, while Plaintiffs allege that "USLS was completely dependent on Ten Oaks Entities for its daily operating funds," Plaintiffs do not allege that USLS and Defendants had "commingled finances" (*id.*) or otherwise allege additional financial information that would corroborate dependency of operations. *See Cruz*, 602 B.R. 855, 872 ("[T]here are no allegations of irregularities regarding Arlon's agreement to provide a cash infusion to HMR. Arlon's decision not to release all of the funds to HMR does not, on its own, plausibly allege financial dependency."); *In re AFA Inv.*, 2012 WL 6544945, at *3 (finding the fifth factor not sufficiently alleged despite the plaintiff's allegation that the employing company "substantially depended" on the parent company's financial support because Plaintiff had "alleged no facts to support this conclusory assertion").

For the foregoing reasons, the fifth factor does not weigh in favor of single employer liability. In light of the Court's conclusions, the Court does not consider each argument raised by the parties.[9]

**B.    Plaintiffs Fail to Allege Other Requirements of the WARN Act as a Matter of Law**

Defendants contend that Plaintiffs fail to allege several requirements of a WARN Act claim. D.I. 6 at 15-18. The Court provides background on the WARN Act and then addresses Defendants' specific contentions.

The WARN Act provides that an "employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order . . . to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee." 29 U.S.C. § 2102(a)(1).

The WARN Act defines "employer," "plant closing" and "mass layoff." *First*, the term "employer" includes "any business enterprise that employs" "100 or more employees, excluding part-time employees." 29 U.S.C. § 2101(a)(1)(A).

*Second*, the "term 'plant closing' means the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2).

*Third*, the "term 'mass layoff' means a reduction in force which— (A) is not the result of a plant closing; and (B) results in an employment loss at the single site of employment during any 30-day period for— (i) (I) at least 33 percent of the employees (excluding any part-time

---

[9] *See, e.g.*, D.I. 6 at 14 ("Furthermore, Defendants and USLS were clearly not 'dependent' upon each other to continue operations given the fact that TOM has continued to operate in the normal course after USLS filed for bankruptcy.").

employees); and (II) at least 50 employees (excluding any part-time employees); or (ii) at least 500 employees (excluding any part-time employees)." 29 U.S.C. § 2101(a)(3).

Three cases are illustrative of these requirements. *First*, in *In re AFA Investment*, the plaintiff alleged that she brought "the action on behalf of herself and approximately 200 other similarly-situated former employees who were terminated in the mass layoff or plant closing" at various "employment sites." *In re AFA Inv.*, 2012 WL 6544945, at *6. The Court held that plaintiff could not "aggregate layoffs from several different sites of employment in order to meet the statutory minimum of 50 employees." *Id.* (citing *Williams v. Phillips Petrol. Co.,* 23 F.3d 930, 934 (5th Cir.1994)). Given that it was "unclear from the face of the Complaint" whether "the minimum number of employees was satisfied at any of the plants," the Court granted the defendants' motion to dismiss. *Id.*

*Second*, in *Guippone v. BH S & B Holdings*, the Court held that plaintiffs' failure to specify the length of time the lead plaintiff worked for the entity at issue was "a critical omission" that supported dismissal. 681 F. Supp. 2d 442, 446.

*Third*, in *Shaw v. Hornblower Cruises & Events*, the Court found that plaintiffs "failed to allege sufficient facts supporting their claim that 'mass layoffs' occurred at multiple sites of employment" because plaintiffs' "bare allegations regarding sites in California [were] too tenuous to enable the Court to find that the WARN Act's notice requirements were likely triggered at those other worksites." No. 21-cv-0408-VM, 2022 WL 16748584, at *7 (S.D.N.Y. Nov. 7, 2022).

Armed with this background, the Court addresses each of Defendants' specific contentions.

*First*, Defendants contend that "Plaintiffs do not allege facts to show that either the Atlanta Facility or the Humble Facility, where the Plaintiffs were employed, experienced employment losses of 50 or more by employees who had been employed for at least six of the preceding

21

months." D.I. 6 at 16. However, Plaintiffs allege "employment losses" of "at least fifty (50) of Defendants' employees as well as 33% of Defendant's [sic] workforce at each Facility, excluding 'part-time employees.'" D.I. 1 ¶ 31. Insofar as Defendants trumpet a lack of specificity (D.I. 6 at 16), the number of employees at specific facilities during a particular period and whether such employees were employed for at least six of the preceding months "is likely within [Defendants'] possession and control and cannot be obtained otherwise." *Shaw v. Hornblower Cruises & Events, LLC*, 21-cv10408-VM, 2023 U.S. Dist. LEXIS 94220, at *7-8 (S.D.N.Y. May 31, 2023).

*Second*, Defendants contend that Plaintiffs "fail to allege facts regarding the number of people who worked at" the Atlanta and Humble facilities. D.I. 6 at 16. Defendants are not, however, entirely correct. As described above, Plaintiffs allege "employment losses" of "at least fifty (50) of Defendants' employees as well as 33% of Defendant's [sic] workforce at each Facility." D.I. 1 ¶ 31. As such, Plaintiffs implicitly allege that USLS employed at least 150 people at each of the Atlanta and Humble facilities. Moreover, while the WARN Act requires that USLS employed "100 or more employees" (29 U.S.C. § 2101(a)(1)), that USLS allegedly terminated 2,000 employees (D.I. 1 ¶ 12) implies that USLS employed more than 100 people.

*Third*, Defendants contend that Plaintiffs fail to "allege facts showing the length of their . . . tenure with USLS." D.I. 6 at 16. Like the plaintiffs' failure to do so in *Guippone*, Plaintiffs' failure to specify the length of time that they worked for USLS is "a critical omission" that supports dismissal. *See Guippone*, 681 F. Supp. 2d 442, 446.

*Fourth*, Defendants contend that Plaintiffs fail to provide any factual information regarding where the facilities, other than the Atlanta and Humble facilities, are located. D.I. 6 at 17. Defendants are correct. Like the plaintiffs in *Shaw*, Plaintiffs' "bare allegations regarding" the existence of these other facilities is "too tenuous." *See Shaw*, 2022 WL 16748584, at *7. Plaintiffs

contend that information regarding other facilities is "within the possession and control of the employer." D.I. 12 at 12. However, given "the particular calculations involved in meeting the elements of a WARN Act violation, even when viewing the pleadings in the light most favorable to Plaintiffs, the Court cannot, without more, find it plausible that either plant closings or mass layoffs took place without notice and within the requisite period of time at those other sites." *See* *Shaw*, 2022 WL 16748584, at *7.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants-in-part without prejudice and denies-in-part Defendants' Motion. As a result, the Court will permit Plaintiffs to file an amended complaint. Insofar as Plaintiffs do file an amended complaint that survives any motion to dismiss, Defendants may re-raise their request for bifurcated and expedited discovery, and the Court will consider the merits of those requests at that time. An Order consistent with this Memorandum Opinion will be entered.